Filed 7/28/26  P. v. Doan CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>TIN DUC DOAN,<br><br>  Defendant and Appellant. | H052907<br>(Santa Clara County<br> Super. Ct. No. C2304219) |

A jury convicted defendant Tin Duc Doan of six sexual crimes committed against his minor daughter, including four counts of forcible lewd or lascivious act on a child under age 14 (Pen. Code,[1] § 288, subd. (b)(1) (§ 288(b)(1))).  The trial court sentenced Doan to 52 years in prison.

On appeal, Doan contends the trial court erred by precluding cross-examination of the victim about school absences and poor grades, instructing the jury on unanimity using CALCRIM No. 3501 (CALCRIM 3501), and imposing upper term sentences on the forcible lewd or lascivious act convictions because the alleged aggravating circumstances constituted elements of the charged offense.  Doan further claims that his defense

---

[1] All further unspecified statutory references are to the Penal Code.

counsel was prejudicially ineffective for not objecting to the court's failure to state its reasons for imposing a consecutive sentence on a conviction of forcible sexual penetration (§ 289, subd. (a)(1)(A)).  In supplemental briefing filed upon this court's request, Doan contends the 10-year upper term sentences imposed on his forcible lewd or lascivious act convictions violate the prohibition against ex post facto laws.  The Attorney General agrees.

For the reasons explained below, we reject Doan's claims of evidentiary and instructional error.  However, because Doan's 10-year prison terms constitute ex post facto punishment, we reverse the judgment, vacate Doan's sentence, and remand for a new sentencing hearing.

## I.  FACTS AND PROCEDURAL BACKGROUND

A. *Charges*

In October 2024, the Santa Clara County District Attorney filed a second amended information (information) charging Doan with six sexual crimes committed against N. Doe,[2] namely, four counts of forcible lewd or lascivious act on a child under age 14 (§ 288(b)(1); counts 1–4), attempted forcible rape (§§ 261, subd. (a)(2), 664; count 5), and forcible sexual penetration (§ 289, subd. (a)(1)(A); count 6).  The offenses in counts 1 through 4 allegedly occurred about and between April 2007 and March 2015; the offenses in counts 5 and 6 allegedly occurred between April 2017 and March 2018.  The information further alleged in each count the aggravating circumstances that Doan took advantage of a position of trust or confidence to

---

[2] The information identified the minor victim by her first name and the pseudonym "Doe."  We refer to the minor by the first initial of her first name (and hereafter as Doe) and other persons by their initials to protect personal privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(4), (10)–(11).)

commit the offense (Cal. Rules of Court,[3] rule 4.421(a)(11)), and that the victim was particularly vulnerable (rule 4.421(a)(3)).

B. *Prosecution Evidence at Trial[4]*

Doan was born in 1970. His daughter, Doe, was born in 2001. At the time of Doan's trial in October 2024, Doe was 23 years old and about to graduate from nursing school.

Doe testified that when she was two years old, she and her mother moved to the United States from Vietnam and began living with Doan and his extended family. Doe, her mother, and Doan eventually resided in a house in San Jose with Doe's paternal grandparents, her aunt and uncle, and two cousins (one of whom is N.D.). Doe initially slept in a room with her parents and later shared a bedroom with her cousins' grandmother. Doe's mother worked many hours each day. Doan was Doe's primary caretaker. Doan would leave for work at 5:00 a.m. and return around 3:00 p.m.

Doe explained that her family primarily spoke Vietnamese at home, her family's culture was "very traditional," and children were expected to defer and listen to their elders.[5] If Doe wanted a snack, she had to ask Doan for permission. Doan was responsible for disciplining Doe. If Doe stayed on a computer too long, failed to get good grades, or talked back, Doan would hit Doe on her buttocks more than once with his hand, a coat hanger, or a stick. This discipline happened once or twice a week. Doan sometimes threatened

---

[3] All further unspecified rule references are to the California Rules of Court.

[4] Doan did not present any evidence in his defense.

[5] Doe's cousin N.D. likewise testified that Doe's extended family was a very traditional, conservative Vietnamese family in which "kids' opinions don't really matter."

3

to tell Doe's mother about Doe's misbehavior. Doan's threats scared Doe because she did not want to disappoint her mother.

When Doe was eight or nine years old and in the second (2008–2009 school year) or third grade (2009–2010 school year), Doan began sexually abusing her. While tucking Doe into bed before her mother got home from work, Doan would "go under [Doe's] shirt and touch [her] breasts" with his hand. Doan's conduct "didn't feel right" to Doe, but Doe loved and trusted Doan and she was just "a kid" who thought Doan was "hugging" and "playing" with her. This sort of touching occurred "[a]lmost every day."

Later, when Doe was nine or 10 years old, Doan would sometimes lick Doe's nipples—in addition to touching her breasts. The licking made Doe feel "weird." Doan licked Doe's nipples for a "couple minutes," "[m]any times," almost daily until "[i]t stopped for a little bit when [Doe] was in middle school." Doe also testified that this sort of touching "occurred uninterrupted essentially from the second or third grade through at least the sixth grade."[6] Doan was usually "grumpy," but when Doan touched Doe, he "would laugh, smile, [and] joke around."

When Doe was in the fourth or fifth grade, she told her mother that she (Doe) did not "like the way dad touches me." Doe's mother responded by saying "it's okay, [] it's your dad. He's probably just playing with you. You're taking it the wrong way." This response made Doe feel like she was "invisible."

When Doe was in the fifth grade (2011–2012 school year), she told Doan, "can you stop touching me." Doe's statement made Doan "kind of

---

[6] On cross-examination, when defense counsel asked Doe how long the "initial touching[ and] licking of [her] breast" lasted, Doe stated, "From when I was in second or third grade to seventh, eighth grade middle school."

4

upset," which caused Doe to "feel like [she] was wrong" and "shouldn't say that to him." Doan made Doe "feel stupid" for telling him to stop. Soon after Doe told Doan to stop touching her, Doan ceased doing so for two or three months. Thereafter, Doan resumed touching Doe's breasts with his hands and licking her nipples multiple times a week.

Doe recounted an incident of breast touching that occurred when she was in the sixth grade (2012–2013 school year). Doan touched Doe's breasts while she was working on a computer in her room during daytime. Doan's conduct made Doe feel helpless. After Doe "began puberty" and had her first menstrual cycle (when she was in the sixth grade), she had a greater understanding of the sexual nature of the touching and was more uncomfortable.

When Doe was a freshman in high school (2015–2016 school year; 14–15 years old), she, her mother, and Doan moved into a house in Milpitas with Doe's mother's coworker. There, Doe had her own bedroom. Doan resumed his abuse of Doe when she was a sophomore, after finding out that she had a boyfriend. One night, Doan tracked Doe's cell phone, drove to her location at a park, angrily confronted Doe and her boyfriend, and told Doe to leave with Doan. Doan later threatened to tell Doe's mother about the incident, call the police on Doe's boyfriend, and send Doe back to Vietnam. Doan also said to Doe, "Why do you have to go outside and do that stuff? . . . [Y]ou can do it with me."

A few days later (in April 2017), Doan sexually abused Doe on the bed in Doan's room. Doan pulled down Doe's pants and underwear, spread her legs apart, touched her labia and clitoris with his hands, and penetrated her vaginal canal with his finger. Doan also touched Doe's breasts and licked her nipples. Doe was afraid. She told Doan to stop and pushed him off her when

5

she felt his penis on her labia. Doan responded by "saying it's okay. We'll do it next time."

Later that day, when Doe was in her own bed, Doan entered Doe's room and "went up" her shirt and shorts with his hand. Doe "pushed [Doan] off before he could get under [her] underwear." Doan became "[v]ery angry" and threatened Doe. The incident scared Doe.

That same night, Doe sent a message to her cousin N.D.'s girlfriend (T.L.) about Doan's misconduct. At the time that Doe messaged T.L., Doe felt helpless and as though she would probably kill herself if an assault were to happen again.[7]

T.L. testified that she was in Vietnam with N.D. when she received Doe's message about the molestation. T.L. was "shocked" and thought about getting Doe "to safety." T.L. and N.D. attempted to arrange for N.D.'s parents to help get Doe away from Doan. T.L. and N.D. returned home from Vietnam a week or two later.

A few days after T.L. returned from Vietnam, Doe and T.L. met with Doe's mother outside her workplace (a restaurant). T.L. spoke to Doe's mother first while Doe waited in a car. T.L. told Doe's mother that she (T.L.) had something "very heartbreaking" to share, but T.L. wanted Doe's mother to know what was "going on under [her] roof." T.L. relayed that Doan was "molesting his child and he tried to rape her." Doe's mother "was calm, and she said she was going to handle it." T.L. was pleased to hear that response, and left Doe with her mother to talk.

Doe told her mother about Doan's sexual abuse. Doe's mother did not believe Doe, called her a "liar," "ho," and "slut," and said Doan "would never

---

[7] T.L. had previously shared with Doe that she (T.L.) had been molested.

do that." During the conversation, Doe's mother summoned Doan, who arrived and denied "everything." Doe was disappointed but not surprised by her mother's reaction. Doe explained that while she was growing up, she did not have a relationship with her mother, and her mother was very dependent on Doan.

After Doe talked with her mother, Doe messaged T.L. In response, T.L. and N.D. drove to a location a few miles away from the restaurant to pick up Doe. There, T.L. found Doe and her parents. Doan's demeanor was "defensive and sporadic." T.L. told Doe to get out of Doan's car. Doan responded by telling T.L. she "can't do that," insinuating that T.L. was taking away his child. Doe was scared and crying.

Doe lived at her aunt's house for the rest of her sophomore year. Doe spent the summer of 2017 in Sacramento with her cousin N.D. and T.L.[8] Doe tried to stay in Sacramento for the following school year, but she ended up returning to her family's home. By that point, a meeting of Doe's extended family had occurred, and Doan had moved out of the house. Doe had no relationship with Doan thereafter.

Members of Doe's extended family "acted like nothing happened," and Doe "felt like they were judging [her]" and did not believe her. In February 2023, Doe was at her grandmother's house for a holiday gathering when Doan arrived. Doe's grandmother and, later, Doe's mother asked Doe why she would not say hi to or acknowledge Doan. After this occurred, Doe felt "like it was unfair for [her] to not say anything." She also felt that Doan was being treated normally, while she was being treated as the "bad guy."

---

[8] N.D. testified that while Doe was staying with him and T.L. in Sacramento, Doan called N.D. and told N.D. that what was happening was none of his business and he needed to return Doe to her parents.

On February 13, 2023, Doe reported Doan's sexual abuse to the police. Shortly before calling the police, Doe sent text messages to six members of her extended family. In the first message, Doe stated, inter alia, that Doan had "sexually assaulted" her, " 'wanted to rape' " her, and " 'kept walking into [her] room and always try [*sic*] to touch [her].' " In a subsequent message, Doe told the family members to give Doan "hugs and kisses" while they could because she was going to the police station. Doe further warned her family members that if they were to tell Doan about her messages, Doe would let the police know that they were cooperating with Doan.

Thereafter, Doe's extended family "basically excluded" her and she no longer had contact with them. Doe felt "stronger" by reporting Doan to the police because she was seeking justice for herself. Doe denied making up allegations of abuse out of anger at Doan for being strict with her.

On cross-examination, Doe admitted that she had snuck out of her house on the night that her father tracked her and her boyfriend to the park. Doe also admitted to having left home at night to see her boyfriend three or four times a week for a couple of months before Doan found her at the park. Doe explained that her parents were "too strict" and would not let her "hang out with [her] friends after school." Doe agreed with Doan's defense counsel that "the Vietnamese and Asian people want their kids to get good grades." After Doan moved out of the Milpitas house and Doe moved back from Sacramento, Doe had the "freedom to go []out with [her] friends after school." Additionally, Doe admitted that she had incorrectly testified three months

earlier (at Doan's preliminary hearing) that Doan tried to rape her "three or four times."[9]

C. *Verdicts and Sentence*

The jury convicted Doan on all six counts as charged.

In a bifurcated court trial, the trial court found true the two aggravating circumstances alleged as to each count of conviction.

On January 6, 2025, the trial court sentenced Doan to an aggregate term of 52 years in state prison, comprising four years (upper term) for the attempted forcible rape conviction (§§ 261, subd. (a)(2), 664; count 5), consecutive to 10 years (upper term) for each of the forcible lewd or lascivious act convictions (§ 288(b)(1); counts 1–4) and eight years (upper term) for the forcible sexual penetration conviction (§ 289, subd. (a)(1)(A); count 6).

## II. DISCUSSION

Doan raises two claims of error regarding his convictions: (1) the trial court abused its discretion and violated his constitutional rights by precluding cross-examination of Doe about school absences and poor grades; and (2) the court erred when instructing on unanimity with CALCRIM 3501 for the lewd or lascivious act charges (counts 1–4).

We address Doan's two challenges to his convictions, followed by his three sentencing claims.

---

[9] In addition to the evidence described *ante*, the prosecution presented expert testimony from psychologist Dr. Dawn Blacker on child sexual abuse accommodation syndrome.

A. *Challenge to Restriction of Cross-Examination*

    1. <u>Additional Background</u>

        a. In limine motion proceedings

The prosecutor moved in limine to exclude any character evidence, prior bad acts, or sexual history of the victim under Evidence Code sections 1101, 352, and 782.

At a pretrial hearing on the in limine motions, Doan's defense counsel explained that the event which precipitated Doe's accusations of abuse involved Doe being "caught in a car *during school hours* with a boy, having sex." (Italics added.) Counsel argued he "should be able to at least talk about that aspect of what happened and the fact that she's cutting class and . . . [that] not going to school has an impact on what her motivation is to make this claim." Counsel noted that Doe had said she did not "want her mom to find out because she really doesn't want to hurt her mom." Counsel claimed that "a lot of these things will come out if [he is] allowed to at least examine [Doe] as it relates to cutting school, sneaking out of the house at night, [and] spending the night at other people's houses without telling her parents."

After some discussion of the rape shield law (Evid. Code, § 782), the trial court stated that "one way that we can address both [parties'] interests is, as [defense counsel] proffered, getting into the fact that the alleged victim was cutting school, had a boyfriend, other circumstances that you listed, but not necessarily getting into the 'having sex' part. That would be a violation of the rape shield law." The court added that defense counsel could ask Doe about having a boyfriend and her motives for not wanting to tell her mother about that fact, but that counsel could not ask Doe about sexual relations.

Later in the hearing, the prosecutor argued that "the issues of [Doe] potentially cutting class or being with her boyfriend when she should have been in class, that doesn't pertain to any issue of, for instance, moral turpitude." The prosecutor also argued that such evidence would be inadmissible under Evidence Code section 352 because it "would be substantially more prejudicial than probative." After the trial court asked defense counsel for more specificity regarding the evidence he wished to introduce, counsel requested additional time to respond to the court's inquiry.

In a subsequent pretrial proceeding, the parties and the trial court revisited the character evidence issue. Defense counsel stated that he wished to introduce evidence through Doe's mother "who had testified that, during [Doe's] years in high school, she was cutting class, sneaking out at night, and spending the night at a friend's house without telling her parents." Counsel explained that in 2017, Doan caught Doe at a park "*during the middle of the day* in a vehicle with a boy. She was cutting school."[10] (Italics added.) Counsel also explained that within two weeks of that incident, Doe accused Doan of abuse. Counsel detailed some events that followed Doe's accusation, including Doe disclosing the abuse to her mother, moving out of the family's house for a time, and sending text messages to her extended family before she reported Doan to the police in February 2023.

The prosecutor objected to the proffered evidence from Doe's mother as improper character evidence and potentially hearsay. The prosecutor asserted that "the only basis for relevancy of eliciting information that Ms. Doe skipped class seven years ago would be to inflame the jury's passions against her and make [the jury] think that maybe she was some kind of bad

---

[10] Defense counsel did not express a desire to introduce evidence about Doe's grades.

kid for skipping class when skipping class in and of itself is not a crime." The prosecutor added that it was not known "whether [Doe] was, in fact, skipping class," skipping classes itself had no bearing on her honesty or veracity, and the proffered evidence was inadmissible under Evidence Code sections 352 and 786.[11]

The trial court acknowledged that Doan's discovery of Doe and her boyfriend at the park was evidence of Doe's "potential motive to fabricate." The court stated it would "not take that away from the defense," and defense counsel could address the incident through cross-examination of Doe. The court further stated that counsel could ask Doe if she was "cutting class" or coming home "late in the middle of the night." The court added, "I see the relevance of the -- potentially, the disclosure to the cousin soon after [Doe] may have been caught with a boy in a car. [¶] But I don't think that the jury would find it compelling that seven years later, she's going to the police and raising such huge allegations against her dad for something that never happened, unless it happened."

Defense counsel explained Doe's potential motives for being "mad at" and reporting Doan, including that he had threatened to send Doe to Vietnam in 2017 and Doe was upset because the family continued to treat Doan with respect and did not believe Doe had been victimized. The trial court stated that it would let counsel "explore that to a limited amount," but it did not "want to have a trial within a trial." The court added that the proposed evidence was not subject to Evidence Code section 1101, subdivision

---

[11] Evidence Code section 786 provides: "Evidence of traits of his character other than honesty or veracity, or their opposites, is inadmissible to attack or support the credibility of a witness."

(b), "[b]ecause the character that [counsel was] seeking is character for cutting class."

The trial court ultimately ruled as follows: "All in all, I do think that [cutting class] has some relevance in terms of [Doe's] motivation for possibly fabricating these charges. I think it goes to the heart of the issue for defense. [¶] So I am not going to render it inadmissible. But for the time being, I'm limiting the introduction of that evidence through cross-examination of Ms. N[.] Doe herself, not through the mother, unless [defense counsel] convince[s] me otherwise." The court continued, "[T]o respond to the People, on their [Evidence Code section] 352 objection, I think its probative value exceeds its prejudicial effect. I don't think the conduct is that prejudicial. [¶] Even if she was in a car with a boy during her teenage years, I don't think it's that prejudicial compared to the probative value for the defense such that it might serve as the complaining witness's motivation to fabricate charges."

b. Cross-examination of Doe

During cross-examination of Doe at trial, defense counsel asked Doe whether she had told the police that, in April 2017, Doan discovered she had a boyfriend. Doe answered yes, and the following exchange occurred:

"Q And the way he found out you had a boyfriend is he tracked your phone and found you in [the park] with your boyfriend; correct?

"A Yes.

"Q *And that was when you were cutting school?*

"A *No.*

"Q It was at night?

"A *It was at night.*

"Q So you snuck out of the house to get there?

"A Yes.

13

"Q And during this time would you often sneak out of the house?

"A Yes.

"Q *And would you cut classes during that timeframe as well*?

"[PROSECUTOR]: Object to relevance." (Italics added.)

Defense counsel asked to approach the bench. Following an off the record sidebar discussion, the trial court sustained the prosecutor's objection.[12]

Defense counsel next asked Doe about Doan having tracked her through her cell phone and finding Doe at the park with her boyfriend. Counsel continued:

"Q And you were concerned about that information getting over to your mom; correct?

"A Yes.

"Q You had indicated that you didn't have much relationship with your mom; is that true?

"A Yes.

"Q Why were you worried about her finding out if you didn't have much of a relationship?

"A Because I didn't want to disappoint her.

"Q *What were your grades like*?

"[PROSECUTOR]: Objection. Relevance.

"[DEFENSE COUNSEL]: She already testified --

"THE COURT: Objection is sustained." (Italics added.)

After asking Doe questions about her sneaking out at night and hiding that fact from her parents, defense counsel asked about Doe's parents being

---

[12] Neither the trial court nor counsel for the parties summarized the sidebar discussion for the record.

strict and not letting Doe go out with friends, including after school. Defense counsel next asked:

"Q [] Is part of that the cultural situation where they want you to get good grades?

"A Because I was Vietnamese, they wanted me to get good grades?

"Q Well, that's a cultural situation. I mean, you've talked about there being a cultural divide. That was one of them, right, that as a culture, the Vietnamese and Asian people want their kids to get good grades; right?

"A Yes.

"Q *And you weren't getting good grades, were you*?

"[PROSECUTOR]: Objection. Relevance.

"THE COURT: Sustained.

"Q (BY [DEFENSE COUNSEL]) *They kept you from getting out and playing with your friends because you weren't getting good grades*; right?

"[PROSECUTOR]: Objection. Relevance.

"THE COURT: Sustained." (Italics added.)

2. Legal Principles

All relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, §§ 350, 351.) Relevant evidence includes "evidence relevant to the credibility of a witness . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210; see also *id*., § 780.)

Generally, "[a] party may cross-examine a witness about the witness's motive and bias." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1050 (*Villa*), citing Evid. Code, § 780, subd. (f).) " '[T]he cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness,' including by 'cross-examination directed toward revealing possible biases, prejudices, or ulterior

15

motives of the witness.' [Citation.] 'The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." ' " (*Villa*, at p. 1051.)

"However, the right to cross-examine a witness on potential bias, prejudice, or ulterior motive isn't absolute. 'A trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352.' " (*Villa, supra*, 55 Cal.App.5th at p. 1051.) "Trial courts have broad latitude under [Evidence Code] section 352 to exclude such impeachment evidence, which helps ' "prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." ' " (*Ibid*.)

"A criminal defendant's constitutional right to confront witnesses is violated when the court prohibits the defendant from conducting otherwise appropriate cross-examination designed to show a prototypical kind of bias on the witness's part, and thereby provide the jury with facts from which it could appropriately draw inferences regarding the witness's reliability. But not every restriction on a defendant's cross-examination violates the Constitution. The trial court retains wide latitude to restrict repetitive, prejudicial, confusing, or marginally relevant cross-examination. Unless the defendant can show that the prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation." (*People v. Sánchez* (2016) 63 Cal.4th 411, 450–451 (*Sánchez*) [citing, among other cases, *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680]; see also *Olden v. Kentucky* (1988) 488 U.S. 227, 232; *People v. Brown* (2003) 31 Cal.4th 518, 545.)

16

On appeal, we presume the trial court's evidentiary ruling is correct, and the appellant bears the burden of demonstrating error. (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139–1140.) Generally, "[a] trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705; see also *People v. Clark* (2011) 52 Cal.4th 856, 932.) " ' "[W]e review the [trial court's] ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

A " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

3. Analysis

Doan contends the trial court abused its discretion and violated Doan's constitutional right to confront witnesses by sustaining the prosecutor's objections to defense counsel's question about Doe cutting classes and two questions about Doe's grades. Doan argues, "[i]t was not enough to give ad hoc explanations of [Doe]'s 2017 report to [T.L.] based on her father's discovery of a boyfriend, but the broader context of [Doe]'s poor performance in school was a part and parcel of the evidence that could motivate a strong enough bias to produce a fabrication of so momentous a charge." Doan further notes the apparent change in the court's "mind about cutting classes" between its pretrial ruling and Doe's cross-examination at trial. Doan

17

contends that the curtailment of his cross-examination of Doe was prejudicial under the standard for constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 23–24) as well as the standard for state law error (*Watson*, *supra*, 46 Cal.2d at p. 836).

As a preliminary matter, we agree with the Attorney General that the trial court's pretrial ruling permitting defense counsel to ask Doe if she was cutting class did not prevent the court from changing its ruling during trial. (See *People v. McVey* (2018) 24 Cal.App.5th 405, 413–414, italics omitted ["[T]he trial 'judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling.' "].) In addition, during the pretrial hearings, Doan's defense counsel repeatedly referred to Doe cutting class in the context of her being discovered by Doan at the park during daytime. Given Doe's subsequent testimony that the park incident occurred at night, the trial court might have reasonably decided that the probative value of any generalized class cutting (a relatively mundane act for a teenager) was substantially outweighed by the potential of an undue consumption of time about whether Doe was, in fact, cutting classes. Likewise, the court might have reasonably decided that the probative value of Doe's grades was minimal as to her credibility and may have resulted in an undue consumption of time to determine the exact state of Doe's grades. Thus, we are not persuaded that the court acted in an arbitrary, capricious, or patently absurd manner when it sustained the prosecutor's objections to the questions about class cutting and grades.

Even assuming arguendo that the trial court abused its discretion by curtailing Doan's cross-examination about possible class cutting and bad grades, Doan fails to demonstrate any violation of his constitutional confrontation right and that the state law evidentiary error was prejudicial.

A trial court does not infringe on a defendant's confrontation right by excluding impeachment regarding a matter that has only slight probative value on the issue of credibility. (See *Sánchez, supra*, 63 Cal.4th at p. 451.) The fact that Doe might have been cutting class and receiving poor grades would have had a marginal effect on the jury's view of Doe's credibility under the instant circumstances. The trial court gave Doan's defense counsel wide latitude in cross-examining Doe about the park incident and Doe's concern that her mother would learn about it. In addition, counsel was permitted to elicit from Doe that she often sneaked out of the house at night and believed that her mother and father would be angry at her for doing so. Doe further acknowledged that Vietnamese people generally "want their kids to get good grades" and that Doe's mother wanted Doe to "get an education and work hard." Hence, through cross-examination, Doan's counsel was able to give substance to his proffered theory that Doe was incredible because "it's a situation where, when this all came down [in 2017], she was mad at dad." That Doe may have cut class and received poor grades would not have created a significantly different impression of Doe's alleged bias against Doan or her motivation to fabricate sexual abuse allegations. We thus discern no violation of Doan's constitutional right to confront and cross-examine Doe. (See *People v. Jennings* (1991) 53 Cal.3d 334, 372 [no constitutional violation when the evidence "would impeach the witnesses on collateral matters and was only slightly probative of their veracity"].)

Having concluded that Doan has not shown any constitutional violation in the curtailment of his cross-examination of Doe, and assuming arguendo that the trial court erred under state law in precluding defense counsel from asking questions about Doe's class cutting and grades, we decide that Doan

19

fails to demonstrate he was prejudiced by the court's rulings under the *Watson* standard.

The jury heard a significant amount of evidence about the events surrounding Doe's disclosure of abuse in 2017, as well as her ultimate report of Doan's abuse to the police in 2023. Additionally, during closing argument, defense counsel extensively attacked Doe's credibility. For example, counsel claimed that Doe had fabricated the abuse allegations to "turn the tables on the person who wants to send them to Vietnam." Counsel further argued that because Doe's mother would have known Doe was "getting bad grades" and "sneaking out at night," Doe's claim that she was concerned about upsetting her mother "just does not ring true." Counsel added: "I would submit to you sneaking out at night, not doing well in school, hanging out with friends when you're not supposed to, disobeying rules, you are a bad kid. You're not a good kid in the sense that you get good grades, which is what the Vietnamese culture and Asian culture would like. [¶] They would like their kids and children to succeed. They want them to get good grades. And maybe that's what [Doe] is -- kind of doesn't want to conform to that and blames everything on that culture." When urging the jurors to acquit Doan of all charges, counsel advised the jurors not to "be fooled by the fact that we have a young woman testifying about things that are pretty ugly. Nothing happened."

Considering all the evidence and argument presented to the jury regarding Doe's credibility and the charged offenses, we conclude it is not reasonably probable that a result more favorable to Doan would have resulted in the absence of the complained of curtailment of cross-examination.

20

B. *Challenge to Unanimity Instruction (CALCRIM 3501)*

Doan contends the trial court erred by instructing the jurors with CALCRIM 3501 regarding counts 1 through 4 because the condition precedent for this instruction as stated in *People v. Jones* (1990) 51 Cal.3d 294, 321–322 (*Jones*) was not met.  Doan further asserts that the alleged instructional error amounts to state and federal constitutional error that was prejudicial.

The Attorney General responds that Doan's claim of error is forfeited because he failed to object to the instruction at trial.  The Attorney General further contends the trial court properly instructed the jurors with CALCRIM 3501 because Doe provided generic testimony regarding hundreds of incidents that could constitute a forcible lewd or lascivious act on a child under age 14.  The Attorney General also argues that if any error occurred, it was harmless.

1. Additional Background

During trial, the trial court and counsel for the parties discussed the jury instructions off the record.  The court subsequently stated on the record that its packet of final jury instructions "was stipulated by all."  The court asked the parties if they wished to place anything on the record regarding their discussion of the instructions.  Defense counsel declined the invitation and did not state any objections to the stipulated instructions.

Regarding the four forcible lewd or lascivious act charges (counts 1–4), the trial court instructed the jurors on unanimity with CALCRIM 3501 as follows:  "The defendant is charged with [l]ewd or [l]ascivious [a]ct by [f]orce or [f]ear on a [c]hild [u]nder 14 [y]ears in [c]ounts 1-4 sometime during the period of April 1, 2007 to March 31, 2015.  [¶]  The People have presented evidence of more than one act to prove that the defendant committed these

21

offenses. You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

The trial court further instructed the jurors with CALCRIM No. 3515, stating, "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one."

Regarding the "force, violence, duress, menace, or fear" element of counts 1 through 4 (force or fear element), the trial court instructed that "[d]uress means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant." (Italics omitted.) The court also instructed that "[a]n act is accomplished by fear if the child is actually and reasonably afraid. It is not a defense that the child may have consented to the act." (Italics omitted.)

In closing argument, regarding counts 1 through 4, the prosecutor contended that Doe had "described for [the jurors] hundreds of such acts" of touching that "was a near nightly occurrence for about three years." The prosecutor focused on Doe's fear of Doan and her helplessness during this period.

22

Seemingly referring to CALCRIM 3501, the prosecutor explained: "You need to look at this instruction. You need to decide which of one or two categories we're in. And it's the People's position that we're in [c]ategory 2. The evidence is overwhelming. It is overwhelming. And the defendant is charged with four counts. [¶] And, again, I won't spend too much time on this, but, again, hundreds of times, hundreds of individual offenses night after night after night. [¶] The defendant is guilty of [c]ounts 1 through 4 and the lesser included."

Defense counsel did not address the unanimity instruction in his closing argument. Regarding counts 1 through 4, counsel asserted, "If you believe [Doe], if anything happened, there was certainly no force or violence used." Counsel additionally mentioned that the jury instructions provided for the lesser offense under section 288(a)(1), which does not include a force or fear element and argued that "the People have not proven that there was any force or fear used." Counsel further challenged Doe's credibility stating, inter alia, "There was nothing. Nothing to support or corroborate [Doe]'s testimony that . . . these things happened."

### 2. Legal Principles

The state and federal constitutions require unanimous verdicts. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132; *Ramos v. Louisiana* (2020) 590 U.S. 83, 93.) "[T]he jury must agree unanimously the defendant is guilty of a *specific crime*." (*Russo*, at p. 1132, italics omitted.) "Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid.*) The unanimity requirement " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the

23

defendant committed.' " (*Ibid.*)  Where it is warranted, the court must give a unanimity instruction sua sponte.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.)

In *Jones*, our Supreme Court addressed unanimity when "nonspecific or 'generic' " testimony is presented in a child molestation case.  (*Jones, supra*, 51 Cal.3d at p. 299.)  The court observed that generic testimony often occurs when the defendant "lives with his victim" and the victim "testifies to repeated acts of molestation occurring over a substantial period of time but, lacking any meaningful point of reference, is unable to furnish many specific details, dates or distinguishing characteristics as to individual acts or assaults."  (*Ibid.*)

Regarding the sufficiency of generic testimony, the California Supreme Court explained that the victim "must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy).  Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping').  Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period." (*Jones, supra*, 51 Cal.3d at p. 316.)

The *Jones* court "reject[ed] the contention that jury unanimity is necessarily unattainable where testimony regarding repeated identical offenses is presented in child molestation cases.  In such cases, although the

jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." (*Jones*, *supra*, 51 Cal.3d at p. 321.)

The *Jones* court announced the following rule for unanimity instructions in cases involving generic testimony: "In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Jones*, *supra*, 51 Cal.3d at pp. 321–322.)

CALCRIM 3501 is a "modified instruction" based on the unanimity principles described in *Jones*. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 555 (*Fernandez*).) CALCRIM 3501 "is an alternative instruction to" the standard unanimity instruction, CALCRIM No. 3500. (*Fernandez*, at p. 556.) "CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees 'that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved the defendant committed at least the number of offenses charged].' " (*Ibid.*)

CALCRIM No. 3500 should be given when " 'the evidence indicates the jurors might disagree as to the particular act defendant committed.' "

(*Fernandez*, *supra*, 216 Cal.App.4th at p. 555.)  CALCRIM 3501 should be given " 'when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them.' " (*Fernandez*, at pp. 555–556.)

"We review assertions of instructional error de novo.  [Citation.] Whether the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominantly legal.'  [Citation.]  Accordingly, we examine the issue without deference." (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 751.)

3. Analysis

We need not consider whether Doan's failure to object to CALCRIM 3501 forfeited his claim of instructional error because, assuming arguendo that Doan did not forfeit his claim, the trial court did not err by instructing the jurors with CALCRIM 3501.

Doan asserts that the "evidence of force or duress" for the entire period of alleged sexual abuse "was not strong," and it was "even slighter" for the "pre-pubescent, pre-menstruation period of time."  He further asserts that the jurors "could indeed entertain a reasonable doubt that any of the touchings occurring before [Doe] was in the sixth grade were in fact forcible or under duress.  There was, therefore, a reasonable likelihood of disagreement about the totality of the acts attested by [Doe], and it was inappropriate to give the second *Jones* alternative in CALCRIM No. 3501 in this case."  Additionally, Doan claims that under CALCRIM 3501, the jurors might not have returned unanimous verdicts because "one or more jurors who rejected the prepubescent acts as constituting the crimes charged in counts 1 through 4 could vote for guilt along with the other jurors who believed all the acts were committed as charged in counts 1 through 4."

26

We are not persuaded that the trial court erred under *Jones*. On this record, there is no reasonable likelihood of juror disagreement regarding the particular acts Doan committed for counts 1 through 4. As detailed *ante* (pt. I.B.), Doe testified generally that, beginning when she was eight or nine years old and in the second (2008–2009 school year) or third grade (2009–2010 school year), Doan touched her breasts almost daily while tucking her into bed. He also licked her breasts many times until she was at least in sixth grade (2012–2013 school year). Doe testified further about an incident of breast touching that occurred during the daytime when she was in the sixth grade. Doe additionally described the corporal punishment that Doan perpetrated against her, his threats to tell Doe's mother about any misbehavior, Doan's upset when Doe asked Doan to stop touching her when she was in the fifth grade, and Doe's feeling of helplessness in the face of Doan's abuse.

For his part, Doan offered no evidence to distinguish the acts of molestation. He argued principally that Doe was lying about all the alleged molestation and, alternatively, that the prosecution had not proved the force or fear element for counts 1 through 4. The jurors rejected the lesser, nonforcible offense (§ 288(a)(1)) and found Doan guilty as charged.

Under the instant factual circumstances, "it is unlikely that the jury would have a reasonable disagreement with respect to any particular act or instance of abuse, or could reasonably conclude that some of the victims' testimony was true but other parts were not." (*Fernandez, supra*, 216 Cal.App.4th at p. 558.) Doe provided generic testimony about repeated, indistinguishable acts of molestation by Doan as he put her to bed and specific testimony about a touching that occurred while Doe was using a computer. The evidence presented the jurors with the choice of either

27

believing that Doan committed all the numerous, repetitive acts described by Doe or disbelieving Doe's testimony completely.

That Doan also may have touched Doe after her first menstrual cycle in the sixth grade—which caused Doe to have a greater understanding of and discomfort with the touching—does not indicate that the jurors might have disagreed about the acts Doan committed. Doan's repetitive acts of touching were of the same nature and committed in a manner that sufficiently proved the force or fear element as to all his acts. (See *People v. Soto* (2011) 51 Cal.4th 229, 246 ["Because duress is measured by a purely objective standard, a jury could find that the defendant used threats or intimidation to commit a lewd act without resolving how the victim subjectively perceived or responded to this behavior."]; *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072–1073 ["When the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases."].)

Accordingly, we conclude the trial court properly instructed the jurors using CALCRIM 3501 for counts 1 through 4. (See *Fernandez*, *supra*, 216 Cal.App.4th at pp. 557–558.)

C. *Sentencing Claims*

In his initial appellate briefing, Doan challenges the trial court's imposition of upper term sentences on counts 1 through 4, alleging that the aggravating circumstances constituted elements of the charged offense. Doan additionally claims that his defense counsel was prejudicially ineffective for not objecting to the court's failure to state its reasons for imposing a consecutive sentence on count 6.

In response to this court's request for supplemental briefing,[13] Doan contends the 10-year upper term sentences imposed on counts 1 through 4 violate the prohibition against ex post facto laws. The Attorney General agrees.

For the reasons below, we decide that the sentences on counts 1 through 4 violate the ex post facto prohibition and this matter should be remanded for a full resentencing. Given that decision, we need not consider Doan's ineffective assistance of counsel claim; that claim has been rendered moot. However, for the benefit of the trial court and parties on remand, we address Doan's challenge to the imposition of upper terms on counts 1 through 4 and conclude that the aggravating circumstances do not constitute elements of the charged offense. Hence, on remand, the court may—if it elects to do so—rely on the aggravating circumstances to impose upper terms on counts 1 through 4.

1. <u>Ex Post Facto Violation (Counts 1–4)</u>

Former section 288(b)(1) provided a sentencing triad of three, six, or eight years. (See Stats. 2004, ch. 823, § 7, eff. Jan 1, 2005–Sept. 8, 2010.) Effective September 9, 2010, the Legislature amended section 288(b)(1) to increase the triad to five, eight, or 10 years. (Stats. 2010, ch. 219, § 7.)

The trial court instructed the jurors that the offenses charged in counts 1 through 4 (§ 288(b)(1)) allegedly occurred sometime between April 1, 2007,

---

[13] We asked the parties to address whether: (1) the 10-year prison terms imposed on counts 1 through 4 violated the prohibition against ex post facto laws because the applicable sentencing triad increased from three, six, or eight years to five, eight, or 10 years during the period of the charged offenses (Apr. 1, 2007–Mar. 31, 2015); and (2) the matter should be remanded to the trial court for a new sentencing hearing.

and March 31, 2015. The jurors made no specific finding about the dates of the acts on which they convicted Doan for counts 1 through 4.

At Doan's sentencing hearing, the trial court imposed an aggregate prison term of 52 years, which included four, consecutive 10-year sentences for the forcible lewd or lascivious act convictions.

Doan and the Attorney General agree that the 10-year prison terms imposed on counts 1 through 4 violated the prohibition against ex post facto laws, as do we.

The jury made no finding that the offenses in counts 1 through 4 occurred before the Legislature increased the sentencing triad on September 9, 2010. In addition, the record does not establish that the jury must have based its verdicts on acts occurring after that date. Thus, we conclude the trial court violated the prohibition against ex post facto laws by imposing 10-year terms for Doan's convictions on counts 1 through 4. (See *People v. Hiscox* (2006) 136 Cal.App.4th 253, 257–262 (*Hiscox*).)

As to the remedy for the ex post facto violation, we exercise our discretion to vacate Doan's sentence and remand the matter for full resentencing. (See *Hiscox*, *supra*, 136 Cal.App.4th at p. 262; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893; § 1260.) On remand, the trial court should impose prison terms on counts 1 through 4 in accordance with the triad provided in former section 228(b)(1) (i.e., three, six, or eight years). (Stats. 2004, ch. 823, § 7.)

2. Challenge to Aggravating Circumstances (Counts 1–4)

Notwithstanding our decision to vacate Doan's sentence and remand this matter for resentencing, we address Doan's additional claim that the trial court erred and violated his due process rights by imposing upper terms for his convictions on counts 1 through 4. Doan contends the two aggravating

circumstances used to authorize the upper terms—that Doe "was particularly vulnerable" (rule 4.421(a)(3)) and Doan "took advantage of a position of trust or confidence to commit the offense" (rule 4.421(a)(11))—were subsumed by the duress element of section 288(b)(1).

As noted *ante* (pt. I.C.), in a bifurcated proceeding, the trial court found true both aggravating circumstances. In support of the aggravators, the prosecutor argued that "between the ages of approximately [eight] or [nine] to 12, [Doe] was systemically, over the course of three years, almost nightly, subjected to sexual abuse by her father" and "isolated in a bedroom," and "these offenses happened at night when other members of the family were not there." The prosecutor added that Doe "was subjected to very strict and harsh discipline in that house notwithstanding the sexual abuse," "was at her father's mercy" because her mother was at work, and "was not in a position whatsoever to resist, certainly not physically or even via words, verbally, towards her father who, again, exercised such stern discipline over her."

Defense counsel argued that the aggravating circumstances should be disallowed because "they're part and parcel of the charges themselves" and Doan did not "use excessive force in any way to get [Doe] to comply."

The trial court rejected defense counsel's argument stating, "factually, the [c]ourt does find the fact that the victim was particularly vulnerable to be true and the fact that Mr. Doan took advantage of a position of trust or confidence to commit the offense is true based on the facts articulated by the People." At sentencing, the trial court noted the two aggravating factors and imposed upper terms on counts 1 through 4.

We are not persuaded by Doan's argument that the trial court erred in relying on the aggravating circumstances to impose upper terms on counts 1 through 4. A court may impose an upper term sentence based on a single

properly proven aggravating circumstance. (See *People v. Lynch* (2024) 16 Cal.5th 730, 764.) Rule 4.420(h) provides, "A fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term." (See also *People v. Clark* (1992) 12 Cal.App.4th 663, 666 (*Clark*); *People v. Wilks* (1978) 21 Cal.3d 460, 470.) "A sentencing factor is only an element of the offense, however, if the crime as defined by statute cannot be accomplished without performance of the acts which constitute such factor." (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1262; see also *People v. Zamora* (1991) 230 Cal.App.3d 1627, 1636 [The phrase " 'element of the offense' " refers to "an essential component of the legal definition of the crime considered in the abstract."].) "[W]here the facts surrounding the charged offense exceed the minimum necessary to establish the elements of the crime, the trial court can use such evidence to aggravate the sentence. [Citation.] Stated another way, rule 420(d)[14] does not preclude a court from using facts to aggravate a sentence when those facts establish elements not required for the underlying crime." (*People v. Castorena* (1996) 51 Cal.App.4th 558, 562, italics & boldface omitted (*Castorena*).)

Section 288(b)(1) provides, "A person who commits an act described in subdivision (a) [i.e., a lewd or lascivious act on a child under 14] by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony." " ' " '[D]uress' " ' " as used in section 288, subdivision (b)(1), ' "means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which

---

[14] A precursor to rule 4.420(h), former rule 420(d) provided, "A fact that is an element of the crime shall not be used to impose the upper term." (See rule 420(d), as adopted Jan. 1, 1991.)

32

otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted." ' [Citations.] '[D]uress is measured by a purely objective standard . . .. [T]he focus must be on the defendant's wrongful act, not the victim's response to it.' " (*People v. Martinez* (2024) 105 Cal.App.5th 178, 189.) "Fear" as defined in section 288(b)(1) means: " '(1) "A feeling of alarm or disquiet caused by the expectation of danger, pain, disaster, or the like; terror; dread; apprehension" [citation] and (2) "Extreme reverence or awe, as toward a supreme power." ' " (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 939–940; see also CALCRIM No. 1111, italics omitted ["An act is accomplished by fear if the child is actually and reasonably afraid [or (he/she) is actually but unreasonably afraid and the defendant knows of (his/her) fear and takes advantage of it]."].)

"[F]or purposes of finding the aggravating factor of particular vulnerability, ' "[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." [Citation.]' [Citation.] Thus, a crime victim can be deemed particularly vulnerable as an aggravating factor 'for reasons not based solely on age, including the victim's relationship with the defendant and his abuse of a position of trust.' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154; see also CALCRIM No. 3226.) " '[P]articular vulnerability' is determined in light of the 'total milieu in which the commission of the crime occurred.' " (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1694 (*Dancer*), disapproved on another ground in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123.) "[A] victim's extremely young age together with other circumstances like the time and location of the offense can establish 'particular vulnerability' as an aggravating factor." (*Dancer*, at p. 1694.)

The aggravating factor for taking "advantage of a position of trust or confidence to commit the offense" (rule 4.421(a)(11)) focuses on the defendant's " ' "special status" ' vis-à-vis" the victim. (*Dancer*, *supra*, 45 Cal.App.4th at p. 1694.) The CALCRIM instruction for this aggravating factor provides in pertinent part: "To prove this allegation, the People must prove that: [¶] 1. (Prior to/During) the commission of the crime, the defendant (had/developed) a relationship with [the victim]; [¶] 2. This relationship allowed the defendant to occupy a position of trust or caused [the victim] to have confidence in the defendant; [¶] AND [¶] 3. The defendant took advantage of this position of trust or confidence to commit the crime." (CALCRIM No. 3233.)

The aggravating circumstances found true in this case were not identical to the elements of the forcible lewd or lascivious act offenses and thus could be properly considered in aggravation for sentencing. A reasonable jury could find duress and fear under section 288(b)(1) without regard to whether the victim was unusually susceptible to the defendant's criminal act or had a relationship with the defendant that allowed the defendant to occupy a position of trust or caused the victim to have confidence. (See *Burbine*, supra, 106 Cal.App.4th at pp. 1262–1263; *Clark*, *supra*, 12 Cal.App.4th at p. 666.) Likewise, the evidence described by the prosecutor at the bifurcated court trial provided sufficient grounds for the trial court to find that the aggravating facts surrounding counts 1 through 4 "exceed[ed] the minimum necessary to establish the elements of the crime." (*Castorena*, *supra*, 51 Cal.App.4th at p. 562.)

We are not persuaded by Doan's assertion that the aggravating factors "comprised a single factor that was subsumed into the element of duress." For this assertion, Doan cites *People v. Fernandez* (1990) 226 Cal.App.3d 669.

34

That decision, however, is factually inapposite. The trial court in *Fernandez* imposed a sentence of 330 years in prison, supported only by its incorporation by reference of the aggravating factors listed in the probation report, which contained a verbatim list of the factors stated in the California Rules of Court. (*Id*. at pp. 677–681.) By contrast, the trial court in the instant case rendered its true findings based on specific facts described at the bifurcated court trial which demonstrate that the aggravating factors are not coextensive with each other or the duress element.

We conclude the trial court did not err in relying on its findings that Doe was particularly vulnerable and Doan took advantage of a position of trust or confidence to commit the offense when imposing sentences on counts 1 through 4. At Doan's resentencing, the court may (if it elects to do so) rely on the aggravating circumstances that it found true to impose upper terms on counts 1 through 4. We express no opinion on which term the court should impose.

### III. DISPOSITION

The judgment is reversed, Doan's sentence is vacated, and the matter is remanded for a new sentencing hearing consistent with the views expressed herein. Doan's convictions are affirmed.

_____
Danner, J.

WE CONCUR:

_____
Greenwood, P. J.

_____
Chung, J.*

**H052907**
***People v. Doan***

* Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.